## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SHERRY ANN JORDAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 11-00514-GMS |
| | ) |
| THE TOWN OF MILTON, | ) |
| CLIFFORD M.NEWLANDS, | ) |
| WILLIAM E. PHILLIPS, | ) |
| STEPHEN P. BOONE, and | ) |
| RONDA ABRAHAM, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM

## I. INTRODUCTION

The plaintiff, Sherry Ann Jordan ("Jordan"), filed this lawsuit against the Town of Milton, the Mayor of the Town of Milton, Clifford Newlands ("Newlands"), the Chief of Police of the Town of Milton, William Phillips ("Phillips"), a detective in the Milton Police Department, Stephen Boone ("Boone"), and a councilwoman for the Town of Milton, Ronda Abraham ("Abraham") on June 10, 2011. (D.I. 1.) The Complaint raises a number of claims relating to an alleged dispute between Jordan and Phillips, Jordan's 2010 arrest for theft, and her eventual dismissal from her clerical position with the Town of Milton. Specifically, Jordan asserts five separate claims under 42 U.S.C. § 1983 for (1) her warrantless arrest, (2) her arrest for crimes that occurred outside the geographical limits of the Town of Milton, (3) the Town of Milton's abuse of authority to accomplish an administrative task, (4) her loss of employment as a

result of asserting Fifth Amendment protection, and (5) procedural deficiencies at her pre-termination hearing.  (*Id.* at ¶¶ 41–78.)  Jordan also alleges violations of Delaware's Whistleblowers' Protection Act (the "WPA"),[1] wrongful discharge in violation of the implied covenant of good faith and fair dealing, civil conspiracy, libel, and false light.  (*Id.* at ¶¶ 79–113.) For the reasons that follow, the court will grant the defendants' motion for summary judgment with respect to all claims except: (1) Jordan's Whistleblowers' Protection Act claim against the Town of Milton, (2) her § 1983 claim for deprivation of procedural due process rights against Newlands, Abraham, and the Town of Milton, and (3) her § 1983 claim for loss of employment/arrest as a result of asserting Fifth Amendment rights.

## II.    BACKGROUND

Jordan worked for the Town of Milton from January 21, 2003 until December 2, 2010. (*Id.* at ¶¶ 8, 38.)  Between January 1993 and October 2009, she was employed by the Town of Milton Police Department in a clerical position, under the supervision of Phillips.  (D.I. 1 at ¶ 8.) In January of 2009, Phillips accused Jordan of insubordination and suspended her with a recommendation that her employment be terminated.  (*Id.* at ¶ 12.)  That recommendation was eventually withdrawn.  (*Id.* at ¶ 13.)

In the summer of 2009, the Town of Milton attempted to terminate Phillips from his position as Chief of Police.  Though these efforts were ultimately unsuccessful, Jordan testified against Phillips at his pre-termination hearing.  (*Id.* at ¶¶ 14–15.)  On October 9, 2009, in order to protect her from retaliation, the Town of Milton transferred Jordan from her position with the

---

[1] 19 Del. C. § 1701 et. seq.

Police Department to another clerical position in the town's administrative office.[2] (*Id.* at ¶ 16.)

On August 16, 2010, Catherine Jacobi ("Jacobi"), a clerk in the Police Department who was responsible for purchasing office supplies, reported irregularities with the receipt of incentive checks from Staples, the office supply chain. (*Id.* at ¶ 22.) Under the Staples incentive program, customers earn store credit for purchases and the return of ink jet printer cartridges for recycling. (D.I. 40 at 3.) Each month, Staples mails out a check for the amount of store credit earned that period, and these checks can then be used to make purchases online, over the phone, or at a physical Staples location. (*Id.*) At least as early as November 2009, Jacobi noted that, although the Police Department was enrolled in the program, it was no longer receiving any incentive checks. (*Id.*)

According to the defendants, Jacobi spoke to several Staples representatives on August 4, 2010 regarding this issue and learned that Jordan was listed as the sole contact on the account. (*Id.* at 3–4.) Jacobi advised Staples that Jordan no longer worked for the Police Department and requested that the account be changed to reflect her own contact information. (*Id.* at 4.) However, when Jacobi attempted to log in to the account's page on the Staple's website several days later, she again encountered problems. (*Id.*) Jacobi then learned from another Staples representative that Jordan had called after the attempted changes and placed the account back under her own name and address. (*Id.*)

After Jacobi reported her findings, Boone began an investigation into Jordan's use of the

---

[2] The defendants maintain that Phillips himself actually recommended the transfer of Jordan to a parallel position in Town Hall to avoid any allegations of retaliation. (D.I. 40 at 2.)

3

Staples account.[3] (D.I. 1 at ¶ 22.) On September 28, 2010, Boone attempted to question Jordan at the Police Department. (*Id.* at ¶ 23.) After Jordan refused to make a statement and asserted her Fifth Amendment right against self-incrimination, Boone told her that she was free to leave and escorted her to the door. (*Id.* at ¶¶ 26–27.) Boone then spoke with Phillips, who instructed Boone to offer Jordan the opportunity to resign rather than being arrested. (*Id.* at ¶ 28.) Jordan refused to resign, and Boone arrested her for seven counts of misdemeanor theft. (*Id.* at ¶ 29.) The Police Department subsequently issued a press release stating:

> On September 28, 2010, Milton Police arrested Sherry Jordan (37) of Millsboro for seven counts of Theft (M).
>
> Milton Police investigated an internal theft where approximately $187.00 was stolen on seven different occasions in 2009 and 2012. Milton Police developed Jordan as a suspect and obtained warrants for Jordan.
>
> Jordan was arraigned and released on $700.00 unsecured bond pending a later court appearance.

(D.I. 40-11, Ex. J.)

Newland immediately placed Jordan on suspension with a recommendation for termination, and the Town Council conducted a pre-termination hearing on November 23, 2009. (*Id.* at ¶¶ 30, 32.)   Abraham was appointed as the hearing officer, and, though all councilmembers were present for the proceeding, the termination decision was left to Abraham alone. (*Id.* at ¶¶ 32, 36.) On December 2, 2010, Abraham issued a report terminating Jordan's employment for misconduct and insubordination. (*Id.* at ¶ 38.)

## III.   STANDARD OF REVIEW

---

[3] Jordan claims that this investigation occurred "[a]t the instruction of Chief Phillips and under Chief Phillips' supervision." (D.I. 1 at ¶ 22.) The defendants, on the other hand, contend that Phillips referred the matter to Boone but told the detective that he did not wish to participate in the investigation. (D.I. 40 at 4.)

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Facts that could affect the outcome are 'material facts,' and a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party. *Lamont v. New Jersey*, 637 F.3d 177, 182 (3d Cir. 2011).

The movant bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once this initial requirement is met, the burden then shifts to the non-moving party to demonstrate the existence of a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989). In determining whether a genuine issue of material fact exists, the court views the evidence in the light most favorable to the party opposing summary judgment and draws all reasonable interests in that party's favor. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).

## IV. DISCUSSION

Jordan's Complaint contains ten counts, including five separate claims for alleged violations of 42 U.S.C. § 1983.[4] The court notes that Jordan has made no attempt to clarify which claims have been brought against which defendants. Accordingly, the court will assume

---

[4] The Complaint contains two claims labeled as "Count V." (D.I. 1 at ¶¶ 71–87.) For the sake of clarity, the court will follow the defendant's proposed approach and refer to the second Count V—a claim under Delaware's Whistleblowers' Protection Act—as "Count V*."

that Jordan intends to bring each cause of action against all five defendants. The court addresses each claim in turn.

A.  Section 1983 Claims (Counts I–V)

    1.  Warrantless Arrest (Count I)

Jordan first purports to bring a claim under 42 U.S.C. § 1983 in connection with her arguably warrantless arrest. (D.I. 1 at ¶¶ 41–49.) Jordan contends that Boone placed her under arrest before obtaining a warrant despite the fact that none of the alleged thefts occurred in his presence. (D.I. 41 at 6–7.) The defendants maintain that, after Jordan refused to resign, Boone lawfully took her into custody on reasonable suspicion of theft, obtained a warrant within the hour, and only then placed her under arrest. (D.I. 40 at 5–6.) Both parties devote substantial portions of their briefs to a dispute over whether Boone's initial act of restraint was a mere detention under Delaware law or was, in fact, a full arrest. Unfortunately, both the defendants and Jordan seem to miss the fundamental legal question: did the initial restraint of Jordan deprive her of a right protected by § 1983? As a matter of law, the court finds the answer to that question is "no."

The court's analysis of Jordan's § 1983 claims necessarily begins from the statutory language itself:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. "Section 1983 does not, by its own terms, create substantive rights; it

6

provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996); *see also Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). As the United States Supreme Court has made clear, "in any § 1983 action the initial inquiry must focus on whether the two essential elements to a § 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured *by the Constitution or laws of the United States*." *Parrat v. Taylor*, 451 U.S. 527, 535 (1981) (emphasis added), *overruled on other grounds*, *Daniels v. Williams*, 474 U.S. 327 (1986). Put simply, it is black-letter law that a plaintiff cannot bring a claim under § 1983 for the deprivation of a right protected solely by state law or municipal ordinances.[5]

Apparently disregarding this fact, Jordan contends that her arrest was improper under 11 Del. C. § 1904(a), which provides that "[a]n arrest by a peace officer without a warrant for a misdemeanor is lawful whenever the officer has reasonable ground to believe that the person to be arrested has committed a misdemeanor: (1) In the officer's presence; . . . ." (D.I. 41 at 8.) In Jordan's view, her arrest violated Delaware law because the alleged misdemeanor theft did not occur in Boone's presence. (*Id.*) Rather than argue that Boone was entitled to conduct a warrantless arrest under Delaware law, the defendants maintain that Boone merely "detained"

---

[5] This point is well-established in both case law and commentary on the subject. *See, e.g.*, *Baker v. McCollan*, 443 U.S. 137, 146–47 (1979); *McMullen v. Maple Shade Twp.*, 643 F.3d 96, 100 n.5 (3d Cir. 2011); *Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir. 2000); *Kelly v. Cnty. of Montgomery*, No. 08-01660, 2008 WL 3408123, at *8 (E.D. Pa. Aug. 8, 2008); *Eichelman v. Lancaster Cnty.*, 510 F. Supp. 2d 377, 386 (E.D. Pa. 2007); *Popow v. City of Margate*, 476 F. Supp. 1237, 1243 n.3 (D.N.J. 1979); Ivan E. Bodensteiner & Rosalie Berger Levinson, *State & Local Gov't Civil Rights Liability* §1.1 (2d ed. 2012); Martin A Schwartz, *Sword & Shield: A Practical Approach to Section 1983 Litigation* § 1.IV (2006). As such, the court is perplexed by the parties' apparently shared belief that alleged violations of the Delaware Code and Town of Milton ordinances might give rise to § 1983 claims.

Jordan while the warrant was being prepared pursuant to 11 Del. C. § 1902. (D.I. 40 at 9–10.) Section 1902 provides that, under certain circumstances, an officer may stop a person that he reasonably suspects has committed a crime, ask some limited questions, and potentially detain the individual for up to two hours. 11 Del. C. § 1902. Predictably, the parties sharply disagree as to the scope of detention permitted under § 1902.

Unfortunately, the central question here seems to have escaped both parties, as neither so much as mentions a potential violation of Jordan's *federal* rights. As discussed above, the court must focus its § 1983 analysis on whether Jordan's arrest deprived her of "rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parrat*, 451 U.S. at 535. The question of whether her supposed arrest was proper under Delaware law plays little role in that inquiry. *See McMullen v. Maple Shade Twp.*, 643 F.3d 96, 100 n.5 (3d Cir. 2011) ("Many states have enacted laws that afford individuals protections beyond those found in the United States Constitution. But arrests made in violation of these state laws are not, in and of themselves, actionable under § 1983."); *U.S. v. Laville*, 480 F.3d 187, 192 (3d Cir. 2007) ("[T]he validity of an arrest under state law must never be confused or conflated with the Fourth Amendment concept of reasonableness, and . . . the validity of an arrest under state law is at most a factor that a court may consider in assessing the broader question of probable cause."). While Jordan does not point to any violations of federal law, the court will presume that she intends to challenge the propriety of her arrest under the Fourth Amendment.

The Fourth Amendment prohibits "unreasonable" seizures. U.S. Const. amend. IV. While police arrests are "seizures" within the meaning of the Fourth Amendment, *Terry v. Ohio*, 392 U.S. 1, 16 (1968), it is well-settled that "when an officer has probable cause to believe a

8

person committed even a minor crime in his presence . . . [t]he arrest is constitutionally reasonable," *Virginia v. Moore*, 553 U.S. 164, 171 (2008). Likewise, a warrantless felony arrest based upon probable cause presents no Constitutional problem. *United States v. Watson*, 423, U.S. 411, 418 (1976). It is less clear, however, whether the Fourth Amendment ever permits an officer to make an arrest for a misdemeanor occurring outside his presence. In *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001), the Supreme Court stated in a footnote, "We need not, and thus do not, speculate whether the Fourth Amendment entails an 'in the presence' requirement for purposes of misdemeanor arrests." 532 U.S. at 341 n.11. The footnote then quoted an earlier dissent from Justice White, claiming that "the requirement that a misdemeanor must have occurred in the officer's presence to justify a warrantless arrest is not grounded in the Fourth Amendment." *Welsh v. Wisconsin,* 466 U.S. 740, 756 (1984) (White, J., dissenting).

At least one court within the Third Circuit has examined the commentary addressing this footnote and concluded that there is no "presence" requirement for warrantless misdemeanor arrests. *Millbourne v. Baker*, No. 11-cv-1866-JD, 2012 WL 1889148, at *9 (E.D. Pa. May 23, 2012) (citing 3 Wayne R. Lafave, *Search & Seizure* § 5.1 (4th ed. 2012); Thomas Y. Davies, *The Fictional Character of Law-and-Order Originalism: A Case Study of the Distortions and Evasions of Framing-Era Arrest Doctrine in Atwater v. Lago Vista,* 37 Wake Forest L. Rev. 239, 248–49 (2002)). Additionally, the Fourth Circuit, Fifth Circuit, Sixth Circuit, Seventh Circuit, and Ninth Circuit, have found that the Fourth Amendment does not prohibit a warrantless arrest for a misdemeanor occurring outside an officer's presence when that officer has probable cause. *See, e.g.*, *Woods v. City of Chi.*, 234 F.3d 979, 995 (7th Cir. 2000) ("[T]he Fourth Amendment does not require a warrant for a misdemeanor arrest like the one effected here."); *Pyles v. Raisor*,

9

60 F.3d 1211, 1215 (6th Cir. 1995) ("Plainly, Raisor cannot be liable under § 1983 unless he violated one of Pyles' federal constitutional rights. Pyles' rights under Kentucky law, including her right as an alleged misdemeanant to be arrested only when the misdemeanor is committed in the presence of the arresting officer, are not grounded in the federal Constitution and will not support a § 1983 claim."); *Fields v. City of South Houston, Tex.*, 922 F.2d 1183, 1189 (5th Cir. 1991) ("The United States Constitution does not require a warrant for misdemeanors not occurring in the presence of the arresting officer."); *Barry v. Fowler*, 902 F.2d 770, 772 (9th Cir. 1990) ("The requirement that a misdemeanor must have occurred in the officer's presence to justify a warrantless arrest is not grounded in the Fourth Amendment."); *Street v. Surdyka*, 492 F.2d 368, 372 (4th Cir. 1974) ("We do not think the fourth amendment should now be interpreted to prohibit warrantless arrests for misdemeanors committed outside an officer's presence."). While the Third Circuit does not appear to have addressed this issue, for the reasons articulated in the above-cited cases, the court does not believe that the Fourth Amendment prohibits an officer from performing a warrantless arrest for a misdemeanor that occurred outside his presence, so long as probable cause exists.

It follows then that there can be no cause of action for warrantless arrest under 42 U.S.C. § 1983 unless the arresting officer lacked probable cause. As such, even assuming that Boone's initial restraint of Jordan was an "arrest" for Fourth Amendment purposes, Jordan's claim turns on whether Boone had probable cause at the time. Probable cause to arrest exists when the facts and the circumstances within the arresting officer's knowledge are such that he can form a reasonable belief that an offense has been or is being committed by the arrestee. *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000). "Generally, 'the question of probable cause

10

in a [§] 1983 damage suit is one for the jury.' . . . However, a district court may conclude 'that probable cause exists as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding,' and may enter summary judgment accordingly." *Id.* at 788–89.

Here, the court, viewing the evidence in the light most favorable to Jordan, believes that no reasonable jury could find that Boone lacked probable cause to arrest Jordan for theft of the store credits. Since there is no indication that Boone acquired any further evidence between the time that he took Jordan into custody and the time that he applied for the warrant, the court looks to the warrant application to determine what Boone knew at the time of the detention. In his sworn warrant application, Boone described his knowledge as follows: (1) he had learned from a Staples representative of seven occasions on which store credit checks associated with the Police Department's account were redeemed; (2) he was aware that on none of those occasions were the checks redeemed by the Police Department; (3) he was aware that Jacobi learned from a Staples representative that Jordan's name was on the account and that a particular address and phone number were listed for the account; (4) he learned from the Delaware Criminal Justice Information System ("DELJIS") that the address and phone number were Jordan's; (5) he was aware that Jacobi had advised Staples to remove Jordan's name from the account; (6) he was aware that Jacobi learned that Jordan had her personal information added back to the account; and (7) he learned that Staples sends its checks via the mail to the addresses associated with its accounts. (D.I. 41, Ex. L.)    The court notes that, while "[p]robable cause to arrest requires more than mere suspicion . . . it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482–83 (3d Cir.

11

1995). In this case, Boone clearly believed that he had probable cause to arrest at the time of his initial detention of Jordan, and, based on the evidence described in his warrant application, the court must agree. Additionally, while it does not control the court's decision, it is telling that the warrant was, in fact, issued upon Boone's application—this confirms that a neutral magistrate also would have believed probable cause to exist at the time of detention. The court finds that, as a matter of law, Boone had probable cause to make the arrest. As such, Jordan's § 1983 warrantless arrest claim must fail.

The court briefly notes that this claim suffers from several additional deficiencies. First, to the extent the claim is brought against Abraham and Newlands, it must fail, as Jordan has produced no evidence that either individual played any role in her detention.

Additionally, to the extent Jordan brings this claim against the Town of Milton, the court will grant the motion for summary judgment on the alternative grounds that Jordan has failed to produce any evidence suggesting that a "policy or custom" of the Town led to her arrest. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). In order to recover from a municipality, a plaintiff must "(1) identify an allegedly unconstitutional policy or custom, (2) demonstrate that the municipality, through its deliberate and culpable conduct, was the 'moving force' behind the injury alleged; and (3) demonstrate a direct causal link between the municipal action and the alleged deprivation of federal rights." *Trice v. City of Harrington Police Dep't*, No. 11-767-GMS, 2012 WL 70838, at *2 (D. Del. Jan. 9, 2012) (citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)). The Third Circuit has observed:

A government policy or custom can be established in two ways. Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict. A course of conduct is considered to be a "custom" when, though not authorized by

12

law, 'such practices of state officials [are] so permanent and well-settled' as to virtually constitute law.

*Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (quoting *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990)).

While Jordan does make the conclusory allegation that the Town of Milton acquiesced in her arrest in order to eliminate a clerical position and improve its budget position, she offers no evidence in support of her theory. Jordan claims that "[t]he facts clearly show that the Town was not only the moving force behind the civil rights violations, but the catalyst, judge, and jury." (D.I. 41 at 17.) Unfortunately, she cites to nothing in the record that might support that conclusion or demonstrate that a "policy or custom" was established. Accordingly, the court is unable to find that there exists a genuine factual dispute on this point and will grant summary judgment on this alternative basis.

Finally, the court will also grant summary judgment to Boone and Phillips on the alternative basis of qualified immunity. "[T]he affirmative defense of qualified immunity . . . absolves defendants if reasonable officers could have believed their conduct was lawful 'in light of clearly established law and the information the searching officers possessed,' . . . This qualified immunity inquiry is an objective, fact-specific pursuit." *Karnes v. Skrutski*, 62 F.3d 485, 491 (3d Cir. 1995) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). There can be no question that *Atwater* is unclear as to whether the Fourth Amendment prohibits a warrantless arrest for a misdemeanor committed outside the presence of the officer. Thus, even absent the court's ultimate conclusion on this point, Boone and Phillips are entitled to qualified immunity here due to the lack of "clearly established law." *See Millbourne*, 2012 WL 1889148,

13

at \*9 n.11; *see also Baribeau v. City of Minneapolis*, 596 F.3d 465, 488 (8th Cir. 2010) ("For purposes of qualified immunity, therefore, an officer making an arrest for a misdemeanor offense cannot be liable for violating clearly established rights under the Fourth Amendment as long as the officer had probable cause (indeed, even 'arguable' probable cause), that the arrestee committed an offense." (internal citation omitted)); *Vargas-Badillo v. Diaz-Torres*, 114 F.3d 3, 5–6 (1st Cir. 1997).

2. Arrest Outside Jurisdictional Limits (Count II)

Jordan next purports to bring a claim under § 1983 because her arrest was for a crime that allegedly occurred outside the Town of Milton's geographical limits. (D.I. 1 at ¶¶ 50–56.) She contends that the Town Charter generally authorizes Boone to act only within the Town limits. (D.I. 41 at 10.) The defendants argue that the arrest was permitted by the Charter because the victim of the crime—the Town of Milton—clearly exists within those limits and because computer crimes are generally deemed to occur in multiple locations, including the jurisdiction in which the victim is located. (D.I. 43 at 3–4.)

Once again, both parties miss the mark. As with Jordan's warrantless arrest claim above, the central problem here is that she has failed to provide any evidence that the arrest deprived her of "rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parrat*, 451 U.S. at 535. Instead, she points to possible violations of state and local laws, (D.I. 41 at 10–12), a tactic that courts have warned against in similar contexts:

> The fact that law enforcement officials acted beyond the scope of their geographic authority may amount to a violation of state law but does not violate the Fourth Amendment. Hence, even if there were a hypothetical state-law provision expressly forbidding police officers to act outside their geographic jurisdiction, the police officers' action in violation of such provision would not violate the Fourth Amendment, since a violation of state law is not a federal constitutional

14

violation.

*Hopper v. Rinaldi,* No. 07-5323-SRC, 2008 WL 558049, at \*2–3 (D.N.J. Feb. 29, 2008). These violations do not, by themselves, represent intrusions upon constitutional or federal rights and therefore cannot give rise to § 1983 liability. As such, the court will grant the defendants' motion for summary judgment on this claim.

Additionally, Jordan has not argued that Abraham and Newlands played any role in her arrest. Accordingly, the court finds that there is no genuine issue of material fact as to their liability on this claim and will grant the motion for summary judgment as to these two defendants on that alternative basis. The court will also grant summary judgment as to the Town of Milton for the additional reason that Jordan has failed to demonstrate that the extraterritorial arrest occurred pursuant to a municipal policy or custom.

### 3. Abuse of Authority (Count III)

The Complaint next raises a claim under § 1983 for abuse of authority in violation of Jordan's Fourteenth Amendment right to substantive due process.[6] (D.I. 1 at ¶¶ 57–62.) Jordan contends that the Town of Milton was seeking to eliminate two clerical positions and that, pursuant to the Town Charter, the proper way to complete those lay-offs would have been to release Jacobi. (*Id.* at ¶¶ 58–59.) Jordan believes that the defendants, acting in concert, orchestrated her arrest in order to terminate her instead and avoid the requirements of the Charter. (*Id.* at ¶¶ 60–61.) The defendants now move for summary judgment on this claim.

The Supreme Court "ha[s] emphasized time and again that 'the touchstone of due process

---

[6] While no paragraph in the Complaint actually identifies the federal statute or Constitutional provision Jordan believes to have been violated, the heading of Count III indicates that it is for "abuse of authority to accomplish an administrative task." The court understands this Count to allege a violation of Jordan's substantive due process rights under the Fourteenth Amendment.

is protection of the individual against arbitrary action of government,' whether the fault lies in a denial of fundamental procedural fairness or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998) (internal citations omitted). In dealing with challenged executive action, the Supreme Court has maintained that "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense,'" and therefore has "spoken of the cognizable level of executive abuse of power as that which shocks the conscience." *Id.* at 846; *see also Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 190 (3d Cir. 2009); *UA Theatre Circuit v. Twp. of Warrington*, 316 F.3d 392, 399 (3d Cir. 2003).

"To prevail on a non-legislative substantive due process claim, 'a plaintiff must establish as a threshold matter that he has a protected property interest to which the Fourteenth Amendment's due process protection applies.'" *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 139–40 (3d Cir. 2000) (quoting *Woodwind Estates, Ltd. v. Gretkowski*, 205 F.3d 118, 123 (3d Cir. 2000)). This requirement, however, is more stringent than in the procedural due process context. *Reich v. Beharry*, 883 F.2d 239, 244 (3d Cir. 1989) ("[I]n this circuit at least, not all property interests worthy of procedural due process protection are protected by the concept of substantive due process."). If the interest at stake is not constitutionally "fundamental," the Third Circuit has held that "the governmental action is entirely outside the ambit of substantive process and will be upheld so long as the state satisfies the requirements of procedural due process." *Nicholas*, 227 F.3d at 142.

The property interest at issue here appears to be Jordan's interest in continued employment with the Town of Milton. The Third Circuit, however, has previously determined

16

that tenured public employment does not represent a fundamental property interest deserving of substantive due process safeguards. *Id.* at 142–43 ("[The plaintiff's] tenured public employment is a wholly state-created contract right; it bears little resemblance to other rights and property interests that have been deemed fundamental under the Constitution."). Accordingly, Jordan's claim fails as a matter of law, and the court must grant the defendant's motion for summary judgment as to Count III.

### 4. Fifth Amendment Violation (Count IV)

The defendants next move for summary judgment on Jordan's § 1983 claim for arrest and loss of employment as a result of asserting Fifth Amendment rights. The court notes that it is unclear what precisely Jordan is challenging in Count IV. Her brief opposing summary judgment indicates that she takes issue with the supposedly retaliatory nature of the arrest. The heading of the relevant section states, "Plaintiff was only arrested because she refused to be questioned by police and because she refused to resign." (D.I. 41 at 13.) The Complaint, however, suggests that Jordan's claim actually is directed toward her eventual loss of employment as a result of refusing to answer Boone's questions. (D.I. 1 at ¶¶ 69–70.) Given the ambiguity of the claim and the parties' brief treatment of the issue, the court will order supplementary briefing on Count IV, which will proceed as outlined in the accompanying Order.

### 5. Pre-Termination Hearing (Count V)

The defendants next challenge Count V of the Complaint, which presents a § 1983 claim for deprivation of Jordan's procedural due process rights based on the alleged deficiencies of the pre-termination hearing. (D.I. 1 at ¶¶ 71–78.) Jordan argues that she was deprived of due process by (1) the Town Solicitor's dual-role as both prosecutor and advisor to Abraham, (2) the

17

use of hearsay evidence at the hearing, and (3) the fact that Abraham possessed decisional authority as hearing officer. (*Id.* at ¶¶74–76.) The defendants move for summary judgment, arguing that (1) the claim is barred by various immunity doctrines, (2) the claim is improper given a parallel state proceeding, (3) the termination was not based solely on hearsay, (4) the Town Solicitor did not act as an advisor to Abraham, (5) Abraham, as hearing officer, was entitled to make the termination decision alone, and (6) Abraham was not biased. (D.I. 40 at 13–17; D.I. 43 at 9.)

As an initial matter, the court is presently unable to determine whether Abraham is entitled to quasi-judicial immunity. "Quasi-judicial absolute immunity attaches when a public official's role is 'functionally comparable' to that of a judge." *Hamilton v. Leavy*, 322 F.3d 776, 785 (3d Cir. 2003). "Regardless of his job title, if a state official must walk, talk, and act like a judge as part of his job, then he is as absolutely immune from lawsuits arising out of that walking, talking, and acting as are judges who enjoy the title and other formal indicia of office." *Dotzel v. Ashbridge*, 438 F.3d 320, 325 (3d Cir. 2006).

In evaluating whether quasi-judicial immunity applies, the court looks to several factors derived from the Supreme Court's decision in *Butz v. Economou*, 438 U.S. 478 (1978):

First, does a Board Member, like a judge, perform a traditional "adjudicatory" function, in that he decides facts, applies law, and otherwise resolves disputes on the merits (free from direct political influence)? Second, does a Board member, like a judge, decide cases sufficiently controversial that in the absence of absolute immunity, he would be subject to numerous damages actions? Third, does a Board member, like a judge, adjudicate disputes against a backdrop of multiple safeguards designed to protect [the parties'] constitutional rights?

*Dotzel v. Ashbridge*, 438 F.3d 320, 325 (3d Cir. 2006) (quoting *Bettencourt v. Bd. of Registration,* 904 F.2d 772, 783 (1st Cir. 1990)). In *Cleavinger v. Saxner*, 474 U.S. 193 (1985),

18

the Supreme Court similarly articulated the *Butz* factors as: "(a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal." *Id.* at 202.

Here, the court is concerned with the opportunity for political influence. According to Jordan, Newlands selected Abraham to conduct her hearing.[7] (D.I. 1 at ¶ 32.) The appointment of an adjudicatory figure on such an *ad hoc* basis by the mayor and councilmembers surely leaves the door open to political manipulation. Moreover, the defendants' conclusory statement that "there should be no dispute that Ms. Abraham in her role at Ms. Jordan's pre-termination hearing was 'functionally comparable' to that of [sic] a judge," is not particularly helpful. (D.I. 43 at 6.) While the court might be able to decide the question of quasi-judicial immunity had it been presented with evidence addressing the various *Butz* factors, neither side provides more than a cursory examination of this issue. Accordingly, the court will leave the matter unresolved for the time being.

The defendants also attack Jordan's claim on substantive grounds, arguing that she received sufficient due process at the hearing.[8] The Third Circuit has noted that:

---

[7] In fact, the transcript of the hearing indicates that Newlands initially asked Abraham to serve as the hearing officer but that a vote of the Town Council was eventually held due to procedural concerns. (D.I. 41, Ex. M at 3–10.) The motion to appoint Abraham was made and seconded by other members of the Town Council, and Newlands merely added his vote of approval. (*Id.*) Either way, it is clear that Abraham was not already serving a pre-established term in the hearing officer role.

[8] It appears that Jordan had a sufficient property interest in her expectation of continued employment to support a procedural due process claim. While a substantive due process claim requires a showing that the interest at stake was "fundamental," no such requirement follows a procedural due process claim. *See Nicholas*, 227 F.3d at 140–42. Indeed, "it is clear that a contract right is a 'form of property,'" for procedural due process purposes, *Larsen v. Senate of Pa.*, 154 F.3d 82, 92 (3d Cir. 1998) (quoting *United States Trust Co. v. New Jersey*, 431 U.S. 1, 19 n.16

19

[I]n pre-termination hearings, . . . the person being deprived of his "property interest" is entitled to minimum procedural safeguards which are adapted to the particular characteristics of the interests involved and the limited nature of the controversy. These safeguards may include: (1) written notice of the grounds for termination; (2) disclosure of the evidence supporting termination; (3) the right to confront and cross-examine adverse witnesses; (4) an opportunity to be heard in person and to present witnesses and documentary evidence; (5) a neutral and detached hearing body; and (6) a written statement by the fact finders as to the evidence relied upon.

*Chung v. Park*, 514 F.2d 382, 386 (3d Cir. 1975) (citing *Morrisey v. Brewer*, 408 U.S. 471 (1972); *Goldberg v. Kelly*, 397 U.S. 254 (1970)). Because Jordan raises a material factual issue as to whether she received a "neutral and detached hearing body," the court must deny the defendants' motion for summary judgment with respect to Abraham, Newlands, and the Town of Milton.[9] The court, however, will grant the defendant's motion with respect to Boone and Phillips, as Jordan makes no claim that either played any role in the hearing.

B.  Whistleblowers' Protection Act (Count V*)

The defendants next seek summary judgment on Count V*, which alleges violations of Delaware's Whistleblower's Protection Act (the "WPA"). 19 Del. C. § 1701 et seq. Section 1703 provides:

An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or

(1977)), and the Supreme Court has recognized that dismissal from tenured public employment implicates a sufficient property interest, *Perry v. Sinderman*, 408 U.S. 593, 601–02 (1972).

[9] The defendants, in a separate letter, draw the court's attention to an October 31, 2012 Delaware Superior Court judgment "rejecting [Jordan's] due-process and wrongful termination allegations." (D.I. 45.) In their Opening Brief, the defendants argued that Count V should be dismissed or stayed in favor of the then-pending state action. (D.I. 40 at 13–14.) In her Answering Brief, Jordan agreed that, should the state action remain pending, she would stipulate to its dismissal before trial in this case. (D.I. 41 at 17.) She also noted that "[i]f the state court decides these issues in the interim, the findings will constitute *res judicata* or collateral estoppel." (*Id.*)

The defendants now represent that Jordan has "retracted this concession and presently argues that the state-court judgment does not act to preclude any of the claims that she has raised in this action." (D.I. 45.) Since the Superior Court decision was issued after the completion of briefing on the Motion for Summary Judgment, the court will order supplemental briefing on the preclusive effect of that decision.

20

privileges of employment:

(1) Because the employee, or a person acting on behalf of the employee, reports or is about to report to a public body, verbally or in writing, a violation which the employee knows or reasonably believes has occurred or is about to occur, unless the employee knows or has reason to know that the report is false; or

(2) Because an employee participates or is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action, in connection with a violation as defined in this chapter; or

(3) Because an employee refuses to commit or assist in the commission of a violation, as defined in this chapter; or

(4) Because the employee reports verbally or in writing to the employer or to the employee's supervisor a violation, which the employee knows or reasonably believes has occurred or is about to occur, unless the employee knows or has reason to know that the report is false. Provided, however that if the report is verbally made, the employee must establish by clear and convincing evidence that such report was made.

19 Del. C. § 1703. Jordan argues—and the defendants do not dispute—that her 2009 testimony concerning Phillip's "alleged unauthorized alteration of officers' time sheets" represented participation in a hearing in connection with a "violation," as defined in the WPA. (D.I 41 at 19.) Jordan contends that she was arrested and later terminated in retaliation for this testimony. (D.I. 18–20.) Under the WPA, the burden of proof ultimately rests with Jordan to demonstrate "that the primary basis for the discharge, threats, or discrimination alleged to be in violation of this chapter was that the employee undertook an act protected pursuant to § 1703 of this title." 19 Del. C. § 1708.

As an initial matter, the court will grant the motion for summary judgment as to the individual defendants. Delaware courts have made clear that a government employee cannot bring a claim against individual defendants under the WPA. *See, e.g., Meltzer v. City of*

21

*Wilmington*, No. 07C-12-197-MMJ, 2008 WL 4899230, at *2 (Del. Super. Aug. 6, 2008); *Postell v. Eggers*, No. 06C-11-021-JTV, 2008 WL 134830, at *5 (Del. Super. Jan. 15, 2008); *Tomei v. Sharp*, 902 A.2d 757, 767 (Del. Super. 2006).

The court, however, must deny the motion for summary judgment with respect to the Town of Milton. The WPA appears to permit suits against municipalities, and genuine issues of material fact are presented by the dual questions of whether the Town terminated Jordan in retaliation for her testimony and whether the alleged retaliation represented the "primary basis" for the discharge.[10]

C.      Breach of Implied Covenant of Good Faith and Fair Dealing (Count VI)

The defendants next move for summary judgment on Jordan's claim for wrongful discharge through an alleged breach of the covenant of good faith and fair dealing. There is an implied covenant of good faith and fair dealing in every employment contract made under the laws of Delaware. *See, e.g.*, *Town of Cheswold v. Vann*, 9 A.3d 467, 473 n.17 (Del. 2010); *Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 101 (Del. 1992). The Delaware Supreme Court has recognized four situations in which the duty may be breached:

(1) where the employee's termination violates public policy, (2) where the employer misrepresents an important fact and the employee relies on it when deciding to accept a new position or to remain at a present one, (3) where the employer uses its superior

---

[10] The court does not read Delaware's County and Municipal Tort Claims Act (the "CMTCA"), which is discussed in further detail below, as immunizing the Town of Milton from suit under the WPA. 10 Del. C. § 4010 et seq. The court believes the WPA imposes sufficiently specific obligations upon employers so as to constitute a waiver of the Town's CMTCA immunity. *Compare Walls v. Rees*, 569 A.2d 1161, 1167 (Del. 1990) (finding that a "specific and express statutory duty" to release seized property once an accused is acquitted of the charges related to the seizure "operates as an express exception to the governmental immunity provided for in 10 Del. C. § 4011"), *with Heaney v. New Castle Cnty.*, 672 A.2d 11, 14 (Del. 1995) (finding that a general enabling statute allowing park district to acquire real estate and manage officers and property was not specific enough to constitute a waiver). It is, perhaps, noteworthy that Delaware courts have also held that the WPA operates as a statutory waiver of the State's general sovereign immunity. *See Janowski v. Div. of State Police, Dep't of Safety & Homeland Sec.*, 981 A.2d 1166, 1171 (Del. 2009); *Tomei*, 902 A.2d at 763.

22

bargaining power to deprive an employee of identifiable compensation related to an employee's past service, and (4) where an employer through deceit, fraud, and misrepresentation manipulates the record "to create fictitious grounds to terminate employment."

*Bailey v. City of Wilmington*, 766 A.2d 477, 480 (Del. 2001) (citing *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443–44 (Del. 1996)). Here, Jordan contends that her termination falls within both the first and fourth *Pressman* categories and thereby represents a breach of the implied covenant.[11] (D.I. 41 at 20.)

The public policy *Pressman* category requires that "a clear mandate of public policy" be threatened by the termination. *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 441 (Del. 1996). An employee "must assert a public interest recognized by some legislative, administrative or judicial authority, and the employee must occupy a position with responsibility for that particular interest." *Id.* at 441–42 (quoting *Shearin v. E.F. Hutton Grp., Inc.*, 652 A.2d 578, 587–89 (Del. Ch. 1994)); *see also Murphy v. Bancroft Constr. Co.*, No. 02-453-SLR, 2003 WL 22119187, at *3 (D. Del. Sept. 8, 2003) (referring to this as a "two-part test"). With regard to the first prong of this test, the Delaware Supreme Court has suggested that "[e]mployees who uncover and blow the whistle on questionable internal financial and business practices [absent illegality]" may not claim breach of the implied covenant. *See id.* at 442 (alteration in original) (quoting Holloway & Leech, *Employment Termination: Rights and Remedies* 180 (2d ed. 1993)); *see also Paolella v. Browning-Ferris, Inc.*, 158 F.3d 183, 191 (3d Cir. 1998) ("[I]t appears that Delaware will not invoke the public policy exception absent some illegal act by the employer.").

Here, given the WPA discussed above, Jordan's 2009 testimony was arguably in support

---

[11] While Jordan provides some argument as to the fourth category, she leaves the court to guess at her basis for raising the first. (D.I. 41 at 20.) Presumably it is Jordan's position that her termination violated public policy because it occurred in retaliation for her earlier testimony against Phillips.

of "a public interest recognized by some legislative . . . authority." It is not at all clear, however, that Phillips' conduct on which Jordan "blew the whistle" was illegal. Jordan makes no such claim, and no evidence has been presented that Phillips ever faced any criminal charges in connection with his alleged time sheet alterations. Indeed, Phillips ultimately prevailed in his pre-termination hearing. As such, the public policy avenue is closed in this case.

Jordan next contends that her claim falls within the fourth *Pressman* category, "where an employer through deceit, fraud, and misrepresentation manipulates the record 'to create fictitious grounds to terminate employment.'" (D.I. 41 at 20.) While her precise argument regarding this point is unclear, Jordan appears to suggest that her initial arrest—and by extension, her eventual termination—was tainted by misrepresentations about her communications with Staples. (*Id.*) Jacobi's affidavit states that, on August 4, 2010 she attempted to change the Staples account into her own name, advising Staples that Jordan no longer worked for the Police Department. (D.I. 40, Ex. F at ¶¶ 6–7.) Jacobi claims that, on August 13, 2010, a Staples representative told her that Jordan had called after the attempted August 4, 2010 change and placed the account back into her name. (*Id.* at ¶ 8.) Jordan, however, maintains that the Staples communication log associated with the account contradicts Jacobi's story, as it "shows that an updated address, email and telephone number were taken on August 4, 2010," and that "[t]he next entry on the Log is on August 13; presumably the communication that Ms. Jacobi refers to in her affidavit." (D.I. 41 at 19–20.) Apparently, Jordan believes that this inconsistency is indicative of fraud underlying her arrest and subsequent termination.

The problem here is that the Staples communication log actually *does* indicate both phone and Internet communications on August 5, 2010, thus erasing the supposed discrepancy.

(D.I. 41, Ex. S.) While Jacobi's affidavit may well rely on hearsay, there is nothing to suggest fraud underlying her claims or any of the other evidence relied upon by Boone to establish probable cause for the arrest. At this stage, it is not the court's place to evaluate whether Jordan's termination was principally driven by her alleged theft, the town's budget concerns, retaliation, or some other motive. The court merely asks if there is a genuine dispute as to whether the Town of Milton, "through deceit, fraud, and misrepresentation manipulate[d] the record 'to create fictitious grounds to terminate [Jordan's] employment.'" Because Jordan points to no evidence that the record was, in any way, manipulated, the answer to that question must be "no." Even if the Town of Milton's primary motive for discharging Jordan was, in fact, inappropriate, the arrest itself was undoubtedly proper and would have obviated any need to manufacture fictitious grounds for termination.

Jordan next argues that the alleged procedural deficiencies of her pre-termination hearing "support[] her implied covenant claim." (D.I. 41 at 20.) Presumably, it is her position that these procedural issues also place her dismissal within the fourth *Pressman* category, by suggesting that the Town of Milton "through deceit, fraud, and misrepresentation manipulate[d] the record 'to create fictitious grounds to terminate employment.'" The defendants, however, correctly point out that "alleged procedural defects, even if accepted by the jury . . . cannot supply the aspect of fraud, deceit or misrepresentation to support a jury finding that [a defendant] breached the implied covenant of good faith and fair dealing." *Bailey*, 766 A.2d at 480. Put simply, Jordan has not made the requisite allegation that the *grounds* of her termination were fictitious—she has merely challenged the *process* of her dismissal.

Delaware courts have recognized four ways in which to breach the implied covenant of

25

good faith and fair dealing, and there is no genuine dispute that any of the four have occurred here. Accordingly, the court will grant summary judgment on this claim.

      D.     Civil Conspiracy (Count VII)

      The defendants next move for summary judgment on Count VII, Jordan's civil conspiracy claim.[12] In Delaware, a plaintiff alleging civil conspiracy must demonstrate: "(1) [a] confederation or combination of two or more persons; (2) [a]n unlawful act done in furtherance of the conspiracy; and (3) [a]ctual damage." *Nicolet, Inc. v. Nutt*, 52 A.2d 146, 149–50 (Del. 1987). It is well-settled that a civil conspiracy, standing alone, is not actionable. Rather, "'[t]he gravaman [sic] of an action in civil conspiracy is not the conspiracy itself but the underlying wrong which would be actionable absent the conspiracy.' . . . An actionable tort must accompany any conspiracy in order for there to be a recovery." *Anderson v. Airco, Inc.*, No. 02C-12-091-HDR, 2004 WL 2827887, at *3 (Del. Super. Nov. 30, 2004) (quoting *McLaughlin v. Copeland,* 455 F. Supp. 749, 752 (D. Del. 1978)).

      In this case, defendants argue that the first element of the civil conspiracy inquiry cannot be met, as there is no evidence of any agreement to violate Jordan's rights. (D.I. 40 at 18–19.) The Delaware Supreme Court, however, has made clear that no express agreement is necessary. *See Empire Fin. Servs., Inc. v. Bank of N.Y. (Del.)*, 900 A.2d 92, 97 (Del. 2006). All that is required is "evidence of a combination between two or more persons," *id.*, and that evidence need not be direct, *see id.* at 97 n.16 ("[T]he conspirators' 'agreement need not be expressed in

---

[12] The court presumes that Jordan intends to bring a claim for civil conspiracy under Delaware law rather than a civil conspiracy claim under 42 U.S.C. § 1983. While Jordan does not specify this in her Complaint and wholly ignores Count VII in her brief opposing summary judgment, the court believes this conclusion is warranted by the fact that Jordan explicitly identified five separate claims as arising under § 1983. Had Jordan wished to raise an additional § 1983 claim for conspiracy, the court presumes she would have followed the same pattern and identified it as such in a similar fashion.

words and may be implied and understood to exist from the conduct itself.'" (quoting Restatement (Second) of Torts § 876(a) cmt. a)).

Here, there is some evidence suggesting that an agreement might have existed between at least Phillips and Abraham to terminate Jordan's employment, and the alleged violation of Jordan's procedural due process rights might constitute an "unlawful act done in furtherance of the conspiracy." Both present questions of fact that cannot be resolved at this stage, and, as such, the court would generally deny the motion for summary judgment.

Delaware's County and Municipal Tort Claims Act (the "CMTCA"), however, immunizes "all governmental entities and their employees . . . from suit on any and all tort claims seeking recovery of damages." 10 Del. C. § 4011(a). As several decisions have made clear, the CMTCA effectively reestablishes sovereign immunity for Delaware's municipalities from certain types of tort claims. *See, e.g., Carr v. Town of Dewey Beach*, 730 F. Supp. 591, 601 (D. Del. 1990); *Fiat Motors of N. Am., Inc. v. Mayor & Council of the City of Wilmington*, 619 F. Supp. 29, 30 (D. Del. 1985); *Sussex Cnty., Del. v. Morris*, 610 A.2d 1354, 1361 (Del. 1992); *McCaffrey v. City of Wilmington*, No. N12C-01-138-PLA, 2012 WL 3518119, at *3 (Del. Super. Aug. 9, 2012). Since civil conspiracy is a common law tort in Delaware, the CMTCA provides immunity to the defendants on this claim and requires that the court grant summary judgment. *See Nutt*, 52 A.2d at 147; *Shaffer v. Topping*, S11C-01-004-RFS, 2011 WL 2671237, at *3 (Del. Super. July 6, 2011).

E.    Libel and False Light (Counts VIII and IX)

The defendants also move for summary judgment as to Jordan's claims for defamation and false light. The tort of defamation consists of two branches—libel, which is written

27

defamation, and slander, which is oral defamation. *Eaton v. Raven Transport, Inc.*, No. S08C-07-033-RFS, 2010 WL 4703397, at \*2 (Del. Super. Nov. 15, 2010). Generally, the elements of defamation are: "(1) a defamatory communication; (2) publication; (3) the communication refers to the plaintiff; (4) a third party's understanding of the communication's defamatory character; and (5) injury." *Id.* There are, however, several limitations on the assertion of a libel claim. First, "[i]t is hornbook law that truth is an absolute defense to a defamation action." *DeBonaventura v. Nationwide Mut. Ins. Co.*, 428 A.2d 1151, 1155 (Del. 1981). Additionally, a statement of fact will not be deemed libelous if it is "substantially true." *Ramunno v. Cawley*, 705 A.2d 1029, 1035 (Del. 1998). "That is, no libel has occurred where the statement is no more damaging to plaintiff's reputation in the mind of the average reader than a truthful statement would have been. Immaterial errors do not render a statement defamatory so long as the "gist" or "sting" of the statement is true." *Id.*

While Jordan ignores the defamation and false light claims in her opposing brief, the Complaint suggests that the basis for Counts VIII and IX is the press release issued by the Police Department subsequent to her arrest. Jordan contends that the release contains two false and defamatory statements:

> The Press Release states that Jordan stole $187.00 on 7 different occasions, when in fact the aggregate value of the subject Staples Coupons was only $187.00.

> The Press Release twice states that Jordan stole "$187". The symbol "$" indicates U.S. currency. Jordan was never accused of theft of U.S. currency but only of Staples Coupons which could only be used at Staples as credit against purchases and not used as United States legal tender currency.

(D.I. 1. at ¶ 103.) Jordan claims that these statements were false, that they were published to third persons, including news reporters, and that they have caused her injury. (*Id.* at ¶¶ 104–06.)

The defendants respond that they are entitled to summary judgment on these counts because (1) the press release was materially accurate, (2) they are immune under the CMTCA, (3) a "conditional privilege" applies to police statements to the public, and (4) Jordan suffered no injury as a result of the release. (D.I. 40 at 19–20.) The court finds that the CMTCA does grant immunity to the defendants on these claims. As noted above, the CMTCA provides that "all governmental entities and their employees shall be immune from suit on any and all tort claims seeking recovery of damages." 10 Del. C. § 4011(a). Here, the defendants are a "governmental entity" and its "employees," as defined under the CMTCA, *id.* § 4010, both defamation and false light constitute torts under Delaware law, *see, e.g.*, *Wyshock v. Malekzadeh*, No. 91C-09-22, 1992 WL 148002, at *1 (Del. Super. June 10, 1992), and Jordan seeks compensatory damages on both these claims, (D.I. 1 at 17–18). Indeed, courts have found that the CMTCA provides immunity in similar circumstances. *See, e.g.*, *Neuberger v. Gordon*, 567 F. Supp. 2d 622, 631–32 (D. Del. 2008) (holding that the defendants, "in issuing [a] press release and speaking with the media and at county government meetings . . . were acting in their official capacities" and were therefore entitled to immunity); *Dickerson v. Phillips*, No. N10C-08-221-PLA, 2012 WL 2236709, at *2 (Del. Super. June 13, 2012). As such, the court will grant summary judgment on Counts VIII and IX under the CMTCA and will not address the defendants' additional arguments at this time.

## V. CONCLUSION

For the reasons discussed above, the court will grant the defendants' motion for summary judgment as to all claims except: (1) Jordan's § 1983 claim for deprivation of her procedural due process rights against Newlands, Abraham, and the Town of Milton, (2) the § 1983 claim for loss

of employment/arrest as a result of asserting Fifth Amendment rights, and (3) the WPA claim against the Town of Milton.

Dated: January 3 , 2013

CHIEF, UNITED STATES DISTRICT JUDGE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SHERRY ANN JORDAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 11-00514-GMS |
| | ) |
| THE TOWN OF MILTON, | ) |
| CLIFFORD M.NEWLANDS, | ) |
| WILLIAM E. PHILLIPS, | ) |
| STEPHEN P. BOONE, and | ) |
| RONDA ABRAHAM, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## **ORDER**

At Wilmington, this $\underset{\sim}{3}$ day of January 2013, consistent with the memorandum opinion issued this same date, IT IS HEREBY ORDERED THAT:

1. The defendants' Motion for Summary Judgment is GRANTED with respect to all claims except: (a) the plaintiff's Delaware Whistleblowers' Protection Act claim against the Town of Milton, (b) the plaintiff's 42 U.S.C. § 1983 claim for deprivation of procedural due process rights against Clifford M. Newlands, Ronda Abraham, and the Town of Milton, and (c) the plaintiff's § 1983 claim for loss of employment and arrest as a result of asserting Fifth Amendment rights;

2. The parties shall provide supplemental briefing regarding the plaintiff's § 1983 claim for loss of employment and arrest as a result of asserting Fifth Amendment rights;

3. The parties shall provide supplemental briefing regarding the preclusive effect, if any, of the October 31, 2012 Delaware Superior Court decision in *Sherry Jordan v. Town of*

*Milton*, C.A. No. S10A-12-005, on the plaintiff's § 1983 claim for deprivation of procedural due process rights;[1] and

4. The parties' requests for oral argument (D.I. 44; D.I. 46) are DENIED.

_____
CHIEF, UNITED STATES DISTRICT JUDGE

---

[1] Supplemental briefing on this claim and the § 1983 claim for loss of employment and arrest as a result of asserting Fifth Amendment rights will proceed jointly. The defendants shall file a supplemental opening brief of no more than ten pages by January 10, 2013. The plaintiff is then directed to file a supplemental answering brief of no more than ten pages within five days. Once those responsive papers have been filed, the defendants shall file a supplemental reply brief of no more than five pages within five days. Deadlines will be calculated consistent with Rule 6(a) of the Federal Rules of Civil Procedure, the Local Rules, and CM/ECF Procedures. Should the defendants decide not to pursue their Motion for Summary Judgment as to these two claims, they are instructed to inform the court, and no further briefing will be required.